# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        *Plaintiff,*

  vs.

PATRICK STEIN,

        *Defendant.*

Case No. 17-10045-EFM

## MEMORANDUM AND ORDER

A grand jury indicted Defendant Patrick Stein with one count of possessing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). This matter comes before the Court on Stein's Motion to Suppress Evidence and Request for *Franks* hearing (Doc. 30). For the following reasons, the Court grants Stein's request for a *Franks* hearing and—after reviewing and considering the parties' briefs, the relevant evidence, and the oral arguments made by counsel to the Court—denies Stein's Motion to Suppress.

## I.      Factual and Procedural Background

The present charge against Patrick Stein for possession of child pornography arises from a Federal Bureau of Investigation ("FBI") probe into an unrelated criminal matter. In February 2016, a confidential informant alerted the FBI that a militia group called the Crusaders was discussing a violent attack against Muslims in southwestern Kansas. Based on this tip, the FBI

launched what turned into a months-long investigation into three Crusaders members: Stein, Curtis Allen, and Gavin Wright. Over the next several months, with the informant's help, the FBI recorded Stein, Allen, and Wright making plans to detonate multiple bombs at an apartment complex largely occupied by Somalian refugees. The investigation reached its conclusion on October 14, 2016, when Stein delivered approximately 300 pounds of fertilizer to an undercover FBI employee for the purpose of constructing a bomb. The FBI immediately arrested Stein[1] and then obtained and executed a warrant to search Stein's home and vehicle.[2]

The search warrant affidavit listed 16 paragraphs of materials to be searched and seized, including: an extensive list of tools and materials that could be used to manufacture improvised explosive devices ("IEDs"), and any documents, computers, cell phones, or electronic storage devices that could hold information related to the conspiracy.

To support a finding of probable cause, the search warrant affidavit outlined Stein's involvement in the bomb conspiracy, beginning in February 2016 and ending with Stein's arrest in October 2016. Over that time, Stein and his co-conspirators frequently used violent rhetoric against Somali-Muslims, referring to them as "cockroaches." In February 2016, Stein and the FBI's informant conducted surveillance of local Somalian refugees, and Stein made several comments about needing to "eliminate" them; the informant also reported that Stein stated that he was looking for explosives to "blow things up."

---

[1] Wright was arrested shortly after Stein's arrest. Allen was arrested three days prior on unrelated domestic abuse charges and was still in police custody at the time of Stein's arrest.

[2] The FBI, using an apparent omnibus affidavit, also obtained warrants to search Wright's residence and vehicle, as well as two commercial storage units.

In June 2016, Stein called for a meeting with the Crusaders; there, he proposed carrying out an attack against local Muslims as retribution for the night club shooting in Orlando, Florida. Later that same month, Stein, Allen, and the FBI's informant were part of a group call[3] where Stein and Allen discussed surveilling the local Mosques, African Community Center, and several apartments occupied by Somali-Muslims. During this call, Stein stated he wanted to know where the Somalians are so they can "kill all of the motherf*cking cockroaches."

In July 2016, Stein, Allen, Wright, and the informant met in person at G&G Mobile Home Center ("G&G")—a business owned by Wright. During this meeting the group discussed a variety of potential places and people they could target; they also discussed different methods of attack. After this brainstorming session, they decided to pick a specific target and plan of action at their next meeting.

The group reconvened at G&G the following month. Stein and the others agreed to detonate four explosives at an apartment complex where a number of Somali-Muslims lived and where one of the apartments was used as a mosque. The plan was to fill four vehicles with explosives, park the vehicles at the four corners of the complex, and detonate the explosives remotely. Allen volunteered to make the explosives, indicating that he already possessed many of the raw materials needed. Stein was instructed to obtain a rock tumbler to assist in manufacturing the explosives. The affidavit also pointed out that Stein regularly took notes during these meetings and usually returned home with the notes afterwards.

---

[3] Stein and his co-conspirators typically communicated via a mobile phone application called Zello, which has push-to-talk features similar to walkie-talkies.

During the investigation, the FBI informant introduced Stein to an FBI Undercover Covert Employee ("UCE") who was posing as a person who could supply the group with automatic weapons and parts for explosive devices. On October 12, 2016, Stein and the UCE met to discuss such a transaction. They agreed that Stein would provide cash and fertilizer to the UCE and, in exchange, the UCE would construct an explosive device for Stein. Although he did not specify where, Stein mentioned that he had the fertilizer about sixty miles away, which was roughly the distance of both Stein's residence and G&G.[4] The next day, the UCE contacted Stein to set up delivery of the fertilizer. Stein agreed to deliver at least 300 pounds of fertilizer to the UCE the following morning. When Stein delivered the fertilizer, the FBI arrested him and applied for the warrant to search Stein's home and vehicle.

During the search of Stein's home, the FBI seized a laptop computer and upon further inspection discovered that the computer contained child pornography. On October 19, 2016, a grand jury indicted all three men with conspiring to use a weapon of mass destruction in violation of 18 U.S.C. §§ 2, 2332a.[5] On March 16, 2017, in a separate criminal case, a grand jury indicted Stein with one count of possessing child pornography.

Before the trial in the first case, Stein filed a motion to suppress all evidence collected during the search of his home and vehicle, arguing the warrant was overbroad and lacked probable cause that evidence of the crime would be found in his home or vehicle. Stein also requested a *Franks* hearing to determine whether the search warrant affiant—Task Force Officer ("TFO")

---

[4] Stein told the UCE that Wright and Allen had previously mixed explosives at G&G.

[5] *See United States v. Allen et al*, 16-10141. A grand jury indicted Stein, Allen, and Wright with additional, related charges in a superseding indictment on December 14, 2016, and a second superseding indictment on March 16, 2017. None of the superseding indictments included the possession of child pornography charge against Stein.

Chad Moore—omitted material facts that would taint the Magistrate Judge's determination that probable cause existed to search Stein's home.

The Court granted Stein's request and held a *Franks* hearing on March 19, 2018, where TFO Moore provided additional testimony. Stein's counsel elicited testimony from TFO Moore that the FBI possessed evidence indicating Stein did not own a computer. Stein attached four exhibits containing information that, he claims, vitiates probable cause to search Stein's residence for a computer. First, in April 2016, Stein instructed the FBI informant to avoid making plans on a computer because he did not want there to be a record. Second, in August 2016, Stein asked the informant if he knew anyone with a "decent laptop they [want to] get rid of…?" When the informant replied that he did not, Stein responded: "You hear of anybody let me know." Third, three days later, Stein told the informant he had been "in desperate need [of a laptop] for some time…" and that he does all his online activity on his phone because "it's all [he's] got." Fourth, on September 27, 2016, during a recorded conversation between the FBI informant and an unidentified person, the informant stated that Stein does everything on his phone and that Stein does not have internet or a computer. TFO Moore testified that the FBI never provided Stein with a computer.

Immediately following the March 19 *Franks* hearing, the Court orally denied Stein's motion to suppress. The case ultimately proceeded to trial, where a jury convicted Stein, Allen, and Wright on all counts.

On July 20, 2018, Stein filed the motion presently before the Court, requesting a *Franks* hearing and a suppression order. Stein raised substantially the same arguments in this motion that he raised in his other criminal suit. In his brief, Stein argues the FBI intentionally or recklessly omitted information in the affidavit that would have changed the Magistrate Judge's probable

cause determination. He accordingly requested a hearing to determine if the affidavit contained any *Franks* violations. Stein also raised three arguments for suppressing all evidence obtained during the search of his home. First, Stein argued there was no nexus between his suspected crime and his residence. Second, Stein argued the search warrant was overbroad because it failed to list the items to be seized with particularity. Third, Stein argued the search warrant was overbroad because it authorized the seizure of a computer.

On September 11, 2018, the Court held a hearing on Stein's motion. Instead of asking for the Court to conduct a second *Franks* hearing to introduce new evidence, Stein requested the Court grant his motion for a *Franks* hearing and take judicial notice of the transcript and exhibits from the *Franks* hearing held on March 19, 2018, in his other criminal case. The Court agreed to follow that procedure. And the Court is now prepared to rule on Stein's motion to suppress.

## II. Analysis

### A. *Franks* violations

Stein argues the affidavit supporting the warrant to search his home contained material omissions in violation of *Franks v. Delaware*.[6] Under *Franks*, "a Fourth Amendment violation occurs if (1) an officer's affidavit supporting a search warrant application contains a reckless misstatement or omission that (2) is material because, but for it, the warrant could not have lawfully issued."[7] If the Court finds the affidavit intentionally or recklessly omitted material information,

---

[6] 438 U.S. 154 (1978).

[7] *United States v. Herrera*, 782 F.3d 571, 573 (10th Cir. 2015) (citing *Franks*, 438 U.S. at 155–56; *U.S. v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997)); *see also United States v. Artez*, 389 F.3d 1106, 1116 (10th Cir. 2004) ("The standards of deliberate falsehood and reckless disregard set forth in *Franks* apply to material omissions, as well as affirmative falsehoods.") (citations and quotations omitted).

suppression is the proper remedy.[8]  If, however, the Court concludes that the omitted information is not material, meaning it "would not have altered the [M]agistrate [J]udge's decision to authorize the search, then the fruits of the challenged search need not be suppressed."[9]  Thus, to determine materiality, the Court "must add in the omitted facts and assess the affidavit [for probable cause] in that light."[10]

The Court begins with *Franks*' second prong: materiality.  Under this prong, the Court considers whether the affidavit unfairly took Stein's statements out of context, and if the Magistrate Judge would have made a different probable cause determination if more context had been given.  The search warrant affidavit's alleged omissions fall into two categories.  The first category relates to Stein's violent statements against Muslims.  Stein argues that, by including his statements in isolation, the affidavit was designed to inflame the Magistrate Judge's passions against him.  Had the affidavit provided more context, Stein claims it would have been clear to the Magistrate Judge that his violent rhetoric was not serious or that it was protected political speech. The second category relates to information the FBI possessed indicating that Stein did not own or use a computer.  The Court addresses each category of omissions in turn.

1.     *Omissions relating to Stein's anti-Muslim rhetoric*

The first omission Stein takes issue with is from a Zello conference call that included several participants.  The affidavit included the following statement Stein made to a female participant: "Make sure if you start using your bow [and arrows] on them cockroaches, make sure

---

[8] *United States v. Avery*, 295 F.3d 1158, 1166–67 (10th Cir. 2002).

[9] *Id.* at 1167.

[10] *Herrera*, 782 F.3d at 575.

you dip them in pig's blood before you shoot them." Stein admits this may be anti-Muslim rhetoric, but he claims that the statement is taken out of context to unfairly portray Stein as violent in nature. Specifically, Stein notes that the "affidavit fail[ed] to mention this statement was made during a conversation with a female participant who was discussing practicing with her bow and arrow due to the high price of ammunition" and that "[t]his snippet of conversation was taken from over an hour into a five-hour conference call."

The Court understands that Stein's statement—like so many statements people make—was made within the context of a longer conversation. Most of the quotes attributed to Stein were taken from much longer conversations, some of which were hours long. It would prove extraordinarily impractical and ill-advised for the search warrant to include the entirety of every relevant conversation. Undoubtedly, the search warrant affiant needed to exercise some discretion in deciding which excerpts and quotes to include. But after reviewing the longer transcript Stein attached as an exhibit, the Court fails to see how adding more context would influence how one views Stein's statement. Nor is it material that Stein made this comment an hour into a five-hour conversation.

Next, Stein points to another quote in the affidavit taken from an in-person meeting where he told a female participant:

> Garden City for example, I know exactly where probably a majority of those mother*ckers are at in their home…in Garden City…and…they've got these apartment complexes over there where literally every f*cking apartment…that's all it is, f*cking goddamn cockroaches…and…I mean I wouldn't be against if I could get a hold of some RPG's (rocket propelled grenades), I'll run some RPG's right through…I'll blow every goddamn building up right there…boom…I'm outta there.

Stein argues the affidavit wrongly omitted the female participant's response to his statement. She replied: "We gotta be realistic though because I can't get any [RPG's] and you

can't either." Stein responded: "well, there are ways." The female participant answered by changing the subject. Stein argues that this shows the female participant did not take his comments seriously.

Adding more context to Stein's statement would not have altered the Magistrate Judge's probable cause determination. By his words, Stein demonstrated strong animus toward the group of people he was later suspected of targeting with violence. The female participant's response showed that she was doubtful Stein could acquire any RPGs to carry out an attack in the manner he described. But whether the female participant believed Stein had the ability to acquire RPGs is of minimal, if any, relevance. The search warrant affidavit did not authorize a search of Stein's home for RPGs. Stein's statement is relevant to his motive to commit a crime of violence against Somali-Muslims. Adding the female participant's response changes nothing in this regard.

The next omission Stein points to involves a Zello conference call in which Stein made the following statement:

> The only f*cking way this country's ever going to get turned around is it will be a bloodbath and it will be a nasty, messy mother*cker  Unless a lot more people in this country wake up and smell the f*cking coffee and decide they want this country back…we might be too late, if they do wake up…I think we can get it done. But it ain't going to be nothing nice about."

Stein points to the phrase "it will be a bloodbath" as proof that the affiant intended to make Stein's statements "much more menacing and violent than they really are." Specifically, Stein notes that before he made this statement another participant of this call introduced the term "bloodbath." He further argues that his statement was part of a broader, protected political discussion on a possible coming civil war. This argument is not persuasive. Even though the term "bloodbath" did not originate with Stein, he clearly adopted the phrase and expressed an opinion about the role violence would play in achieving the group's objectives.

The Court holds that none of the omitted statements Stein has provided would negate probable cause that Stein was involved in a conspiracy to use a weapon of mass destruction. These omissions, therefore, do not form the basis of a *Franks* violation.

2.      *Omissions relating to Stein's computer use*

Stein asks the Court to consider four additional pieces of information showing he did not own or use a computer. First, Stein draws the Court's attention to an FBI document titled "Initiation of [Field Investigation] of Patrick Stein." This document states that "[Stein] did not want [the informant] to make any plans on a computer because he did not want there to be a record" and "[Stein] would keep any plans secure but would make sure people would still have access to the plans." Stein also highlights conversations between Stein and the informant. For example, in August 2016, Stein asked the informant if he knew anyone selling a laptop. Three days later, Stein told the informant he had been "in desperate need [of a laptop] for some time . . . " and that he does all his online activity on his phone because "it's all [he's] got." Finally, about three weeks before Stein's arrest, the informant made a comment in a recording with an unidentified person that Stein does everything on his phone and that Stein does not have internet or a computer.

The Court concludes that none of these facts would change the Magistrate Judge's probable cause determination. Stein's reliance on his instruction to the FBI informant to avoid using computers is problematic for at least two reasons. First, the statement shows Stein's feelings about *the informant* making plans on a computer; it says nothing about *Stein's* willingness to use computers. Second, the statement was made in the early stages of the group's planning, and it was made because Stein wanted to avoid making records of the group's activities. Even if Stein originally intended to avoid using a computer to prevent leaving a record of the group's activities, there is ample information in the affidavit suggesting that Stein may have abandoned that strategy.

Stein frequently used his phone and the internet in furtherance of the conspiracy, attended a meeting at G&G where Wright used a computer to mark potential targets for their attack, and kept handwritten notes during the group's meetings.

The next two pieces of information Stein relies on are equally unavailing. Stein expressed frustration to the FBI informant that he had to perform all his online activity on his phone because "it's all [he's] got." Stein also stated that he was "in desperate need" of a laptop computer and was looking to acquire one. This indicates Stein did not own a laptop computer at the time he made these comments in late August. It does not, however, undermine the Magistrate Judge's probable cause determination on October 14. If anything, this information shows that, as of August 2016, Stein was actively trying to acquire a computer as soon as possible. Instead of destroying probable cause, this information increases the likelihood that Stein obtained a computer to use in furtherance of this crime.

Lastly, Stein relies on a recorded conversation between the FBI informant and an unidentified person that occurred on September 27, 2016. During this conversation, the informant told the unidentified person that Stein does everything on his phone, and that Stein does not have internet or a computer. The unidentified person cannot be heard on the recording, so the Court cannot ascertain the full context of this conversation. With that in mind, the Court disagrees that this information would strip the warrant of probable cause. The informant's statement is consistent with what Stein told him in August, and it is unclear whether the informant was merely repeating what Stein told him a month earlier, or if the informant had new information that Stein still had no computer. Regardless, this conversation took place weeks before law enforcement searched Stein's home. So, even with this information, the Magistrate Judge could still have found probable cause to search Stein's home for a computer.

Stein identified a significant amount of information he believes was wrongly omitted from the Government's affidavit. The Court holds that none of the omitted information relating to Stein's violent rhetoric against Muslims would negate probable cause. Therefore, the affidavit did not violate *Franks* in this regard. Although a closer call, the omissions regarding Stein's computer ownership and use likewise fail to implicate *Franks*. Stein's strongest argument is his confession to the FBI's informant that he does everything on his phone because he has nothing else. But this is counterbalanced by the fact that Stein made this statement while asking for the informant's help in acquiring a laptop. Indeed, two of the four omissions central to Stein's argument involve Stein discussing his need for a computer. Adding the omitted information to the affidavit would not negate probable cause. And it could have made the Government's application stronger. Therefore, the Court holds the search warrant affidavit did not violate *Franks*.

**B.     Motion to Suppress**

Stein asks the Court to suppress all evidence from the search of his residence for three reasons. First, the warrant affidavit failed to establish an adequate connection between the criminal conduct under investigation and Stein's home. Second, the warrant was unconstitutionally broad because the list of items to be seized was too long to be sufficiently particularized. Third, the warrant was unconstitutionally broad because the Government lacked probable cause that Stein possessed a computer. The Court takes the liberty of addressing the computer issue first.

*1.     Authorizing the seizure of any computers found in Stein's residence*

Stein argues that the search warrant was overbroad because it authorized the seizure of a computer. Stein claims that law enforcement not only lacked reason to believe Stein had a computer, but possessed information to the contrary. Although Stein frames this as an issue of

whether the warrant was unconstitutionally broad, the Court believes it is more appropriately analyzed as a question of probable cause.[11]

"A magistrate judge's task in determining whether probable cause exists to support a search warrant 'is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.' "[12] Because the Fourth Amendment strongly prefers searches to be conducted pursuant to a warrant, a Magistrate Judge's probable-cause ruling is given great deference.[13] To that end, a Magistrate Judge's determination that probable cause exists is valid as long as the warrant affidavit "provide[s] a 'substantial basis' for reaching that conclusion."[14]

Here, Stein argues it is unreasonable to presume a person owns a computer, citing authority estimating that approximately 75 percent of American adults owned a computer at the time of Stein's arrest.[15] While 75 percent is not an insignificant number, the Court agrees it would be unreasonable to presume Stein owned a computer without additional justification. The search warrant affidavit here included a considerable amount of information about Stein's involvement in the conspiracy, which developed over months, and required extensive planning and coordinating

---

[11] At the hearing on September 11, 2018, Stein's counsel explained the distinction is one of remedy. If the warrant lacked probable cause to seize a computer, then the computer and its contents would be inadmissible against Stein at trial. If, however, including the computer in the search warrant made the warrant overbroad, the entire search would be invalid.

[12] *United States v. Tuter*, 240 F.3d 1292, 1295 (10th Cir. 2001) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

[13] *United States v. Biglow*, 562 F.3d 1272, 1280 (10th Cir. 2009) (citing *Massachusetts v. Upton*, 466 U.S. 727, 728, 732–33 (1984)).

[14] *Id.* at 1281 (quoting *Gates*, 462 U.S. at 238–39).

[15] *See United States v. Griffith*, 867 F.3d 1265, 1272 (D.C. Cir. 2017).

between the conspiracy members. The affidavit identified many instances where Stein used electronic devices to communicate with his co-conspirators via the internet. While much of this activity was conducted on Stein's phone, it was reasonable to infer that some of the online activity could have been done on a computer, as well. Furthermore, the affidavit established that, based on the affiant's training and experience, such electronic communications are sometimes automatically downloaded to electronic devices with internet access and can be recovered from the device's "cache." Thus, if Stein did possess a computer, there was a reasonable likelihood that the computer would contain information related to the conspiracy, even if Stein did most of his online activity on his phone. Mindful of the preference for searches to be conducted pursuant to a warrant, and of the deference afforded to a Magistrate Judge's determination, the Court concludes that the Magistrate Judge had a substantial basis to authorize the seizure of any computers found during the search of Stein's residence based solely on the contents of the affidavit.

Furthermore, as discussed above, adding the omitted information to the affidavit does not negate probable cause to seize any computers found in Stein's residence. To the contrary, Stein's explicit desire to acquire a computer only increased the probability that one would be found in his home.

2.      *Stating with particularity the items to be seized*

Stein argues the search warrant authorized the Government to conduct a virtually unlimited search of his home. Under the Fourth Amendment, warrants must describe with particularity the place to be searched and the items to be seized during the search.[16] The particularity requirement

---

[16] *See United States v. Pulliam*, 748 F.3d 967, 972 (10th Cir. 2014) (citing the Fourth Amendment of the United States Constitution).

ensures a search is limited in scope and prevents law enforcement from conducting "a general, exploratory rummaging in a person's belongings."[17]   A warrant's description is "sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized."[18]   Courts use a "common sense" and "practical" approach to the particularity requirement.[19]  Warrants that describe the items to be seized with broad or generic terms may still be valid if "the description is as specific as the circumstances and the nature of the activity under investigation permit."[20]

The search warrant here is sufficiently particularized to withstand Fourth Amendment scrutiny.  Stein argues the "shopping list" of items in the search warrant gave law enforcement authority to conduct a "general fishing expedition and exploratory search"—pointing specifically to the long list of items to be seized in paragraphs A, D, and E of the warrant.  The Court recognizes that the list of items to be seized in the search warrant is broad.  But the Court must consider the nature of the crime being investigated: conspiring to use an improvised explosive device, which can be constructed using many items that are common or seemingly innocuous.  The Court also considers the list of items within the context of the warrant's qualifying language that all items seized must be tied to the construction of improvised explosive devices.[21]   Under these

---

[17] *Davis v. Gracey*, 111 F.3d 1472, 1478 (10th Cir. 1997) (quotation marks and citations omitted).

[18] *United States v. Leary*, 846 F.2d 592, 600 (10th Cir. 1988) (quotation omitted).

[19] *Gracey*, 111 F.3d at 1478.

[20] *Leary*, 846 F.2d at 600 (quotation omitted).

[21] *See United States v. Campos*, 221 F.3d 1143, 1147 (10th Cir. 2000) ("[S]earch warrants were written with sufficient particularity because the items listed on the warrants were qualified by phrases that emphasized that the items sought were those related to [the crime being investigated].") (citing *United States v. Hall*, 142 F.3d 988, 996–97 (7th Cir. 1998)).

circumstances, the Court concludes that the warrant adequately informed law enforcement what items could and could not be seized.

### 3. *Nexus between the conspiracy and Stein's home*

Stein argues the affidavit contained insufficient information connecting his suspected crime to his residence. It is settled law that probable cause requires a nexus between the suspected criminal activity and the place to be searched.[22] Probable cause to believe a person is engaged in criminal activity does not equate to probable cause to search the person's home.[23] Instead, "there must be additional evidence linking the person's home to the suspected criminal activity."[24] The "additional evidence" requirement, however, is not an onerous one.[25] The evidence necessary to connect "a defendant's suspected activity to his residence may [] take the form of inferences a magistrate judge reasonably draws from the Government's evidence."[26] The affidavit is not required to "draw an explicit connection between a suspect's activities and his residence for a Fourth Amendment nexus to exist."[27] Neither is it necessary to have "hard evidence" or "personal knowledge" linking the unlawful activity to the defendant's home.[28]

---

[22] *United States v. Rowland*, 145 F.3d 1194, 1203–04 (10th Cir. 1998) (citations omitted).

[23] *United States v. Harris*, 735 F.3d 1187, 1191 (10th Cir. 2013).

[24] *Rowland*, 145 F.3d at 1204.

[25] *Biglow*, 562 F.3d at 1279 ("While the nexus requirement—like probable cause itself—is not reducible 'to a neat set of legal rules,' . . . our case law reveals that little 'additional evidence' is generally required to satisfy the Fourth Amendment's strictures.") (internal citations omitted).

[26] *Id.* at 1280.

[27] *Id.*

[28] *Id.* at 1279.

In sum, "magistrate judges may draw their own reasonable conclusions, based on the Government's affidavit and the 'practical considerations of everyday life,' as to the likelihood that certain evidence will be found at a particular place."[29] In *Biglow*, the Tenth Circuit identified a non-exhaustive list of factors relevant to such a determination, including: "(1) the type of crime at issue, (2) the extent of a suspect's opportunity for concealment, (3) the nature of the evidence sought, and (4) all reasonable inferences as to where a criminal would likely keep such evidence."[30]

The *Biglow* factors favor finding a nexus between the suspected crime and Stein's residence.[31] This crime—conspiring to use a weapon of mass destruction—was complex, required months of planning, and involved multiple locations; Stein's opportunity to conceal evidence was extensive; the nature of the evidence sought was wide-ranging, including physical and digital records of their plans, as well as the raw materials needed to execute those plans; and, given the sensitive nature of the records and the ubiquity of the materials that could be used to construct an IED, it is reasonable to infer such items were stored at Stein's residence.

Furthermore, the Government's affidavit provided enough "additional information" linking the conspiracy to Stein's residence to satisfy the Fourth Amendment's nexus requirement. The affidavit provided 11 pages of detailed information about Stein and his co-conspirators' plot to bomb an apartment complex, and Stein does not contest the Government had probable cause he was involved in the conspiracy. Additionally, according to the affidavit, Stein kept handwritten notes during some of the group's meetings, took the notes with him when he left, and generally

---

[29] *Id.* at 1272.

[30] *Id.* at 1279 (citing *Anthony v. United States*, 667 F.2d 870, 874 (10th Cir. 1981); *United States v. Rahn*, 511 F.2d 290, 293 (10th Cir. 1975)).

[31] *See Biglow*, 562 F.3d at 1279.

returned home after the meetings. Stein argues this is insufficient to find a nexus between the crime and his home, noting that "[t]he affiant cannot even allege that Mr. Stein always went home after the meetings or that he took the notes into his home when he did." However, the relevant inquiry is whether there is a fair probability that evidence of the crime—here, the notes—would be found in Stein's home. Probable cause does not require "hard evidence" Stein stored the notes there. Given the sensitive nature of these documents, it was reasonable to infer that Stein would protect them in a safe location.[32] That Stein did not *always* return home after these meetings does not eliminate the fair probability the notes would be found there.

The affidavit also linked Stein's home to materials used to manufacture explosive devices. For example, Stein told the UCE that he possessed at least 300 pounds of fertilizer to manufacture a bomb. According to Stein, the fertilizer was located about 60 miles away from where Stein and the UCE were meeting. The affidavit pointed out that Stein's residence, as well as G&G, were approximately 60 miles away from that location. Stein raises two arguments for why this fact does not adequately connect Stein's home to the crime. First, Stein notes that he offered to leave the "shop" unlocked for the UCE to pick up the fertilizer.[33] Second, by the time the Government applied for the search warrant, Stein was under arrest and the fertilizer was in the Government's possession.

The Court is unpersuaded by these arguments. Stein's comment that he possessed fertilizer within 60 miles could, of course, include any location within 60 miles. But it is reasonable to infer

---

[32] *See United States v. Reyes*, 798 F.2d 380, 382 (10th Cir. 1986) ("The affidavit did indicate that participants in the conspiracy maintained records regarding their activities. It is reasonable to assume that certain types of evidence would be kept at a defendant's residence and an affidavit need not contain personal observations that a defendant did keep such evidence at his residence.") (citation omitted).

[33] Stein and the UCE agreed to meet in person, so Stein never clarified what he meant by the "shop."

from this comment that the fertilizer was kept somewhere approximately 60 miles away, which would include Stein's residence and G&G. Perhaps—based on Stein's vague reference to the "shop"—the inference that the fertilizer was kept at G&G was stronger than the inference that it was located at Stein's home. But it is completely "uncontroversial" that "officers can follow alternative and competing leads when both are supported by a 'fair probability' they will yield something productive."[34] Based on Stein's comment, it was reasonable to infer that he stored the fertilizer at his residence. Although the fertilizer had been removed from its previous location, the inference that Stein was storing it at his home—combined with the additional information in the affidavit about Stein's involvement in the conspiracy, including that he was tasked with collecting tools to assist in manufacturing an explosive device—provides a sufficient nexus between the crime suspected and Stein's residence.

Stein also briefly argues that the affidavit failed to demonstrate by which means the Government confirmed that the place they searched—a mobile home in Wright, Kansas—was Stein's residence. Stein makes this argument in a one-sentence paragraph citing to the Tenth Circuit's decision in *United States v. Roach*.[35] The Government did not address this argument in its Response to Stein's Motion to Suppress.

In *Roach*, law enforcement sought a warrant to search 15 residences connected to a drug-trafficking conspiracy involving multiple suspects.[36] Included in the 15 residences was an apartment belonging to Roach's girlfriend—but it was Roach, not his girlfriend, who was a

---

[34] *Harris*, 735 F.3d at 1194 (quoting *United States v. Ludwig*, 641 F.3d 1243, 1252 (10th Cir. 2011)).

[35] 582 F.3d 1192 (10th Cir. 2009).

[36] *Id.* at 1196.

suspected participant in the conspiracy. The warrant affidavit stated that law enforcement believed Roach lived at his girlfriend's apartment, and verified this by using at least one of several investigatory methods.[37] But it was unclear from the affidavit which method law enforcement used to verify Roach resided at this apartment. For this reason, the Tenth Circuit held "[t]here is simply not enough evidence on the face of the affidavit for a magistrate to conclude reasonably that the requisite nexus between Roach and [his girlfriend's apartment] was present."[38]

Similarly, the Court concludes—despite sufficient facts in the affidavit to uphold the Magistrate Judge's determination that probable cause existed to search Stein's residence—the Government's affidavit did not include enough facts demonstrating this mobile home *was* Stein's residence. This does not, however, resolve the matter. In *Roach*, the Tenth Circuit concluded that, notwithstanding the warrant's lack of probable cause connecting Roach to the apartment, suppression was precluded by the good-faith exception to the warrant requirement. The Court will now consider whether the good-faith exception likewise precludes suppression here.

### 4.     *The good-faith exception*

Both Stein and the Government address the good-faith exception as it pertains to whether there was sufficient reason to believe Stein kept evidence related to the conspiracy at his residence, and whether there was reason to believe Stein used a computer in furtherance of this conspiracy. However, neither party addresses the good-faith exception as it applies to whether the warrant

---

[37] The warrant affidavit stated that law enforcement verified that each of the individuals under investigation were linked to their residence by "checking for utilities information, driver's license records, real estate records, Wichita Police Department records, tax records, social security records, U.S. Postal Service records, interviews and/or surveillance." *Id.* at 1198.

[38] *Id.* at 1203.

adequately showed that Stein resided at this mobile home. That said, the Court will now consider whether the good-faith exception applies here.

In *United States v. Leon*,[39] the Supreme Court explained that "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates."[40] Consequently, "[i]f a search warrant is later found to lack probable cause, evidence seized pursuant to the warrant 'does not necessarily have to be suppressed.' "[41] The evidence obtained in the search is still admissible if "the executing officer acted with an objective good-faith belief that the warrant was properly issued by a neutral magistrate."[42] *Leon*'s good-faith exception means that suppression is improper unless the executing officers' reliance on a magistrate's issuance of a warrant was "entirely unreasonable" because the affidavit was "devoid of factual support."[43] A warrant affidavit "is not devoid of factual support if it establishes a *minimally sufficient nexus* between the illegal activity and the place to be searched."[44] Importantly, the minimal nexus requirement requires neither "hard evidence" nor "personal knowledge" linking the suspected crime to the place to be searched.[45]

In *Roach*, the Tenth Circuit addressed whether the good-faith exception precludes suppression when the warrant affidavit failed to adequately show how law enforcement confirmed

---

[39] 468 U.S. 897 (1984).

[40] *Id.* at 916.

[41] *United States v. Gutierrez*, 498 F. App'x 786, 790 (10th Cir. 2012) (quoting *United States v. Riccardi*, 405 F.3d 852, 863 (10th Cir. 2005)).

[42] *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000) (citation omitted).

[43] *United States v. Campbell*, 603 F.3d 1218, 1231 (10th Cir. 2010) (quotations and citations omitted).

[44] *Id.* (emphasis added) (quotations, citations, and alterations omitted).

[45] *Id.* (quotation omitted).

where a suspect resided. The Tenth Circuit upheld the search based on the good-faith exception, concluding it was not "entirely unreasonable" for the officers executing the warrant to rely on the magistrate judge's authorization of the search.[46] The affidavit in *Roach* explicitly stated that the apartment was Roach's residence and that law enforcement verified this fact. Furthermore, the affidavit indicated—although it did not explicitly state—the officers verified this was Roach's residence using at least one of several investigatory methods, including "surveillance" or "interviews." The Tenth Circuit held that "any one of [these methods] would—assuming they were successful—provide a 'minimal nexus' connecting Roach to the address" and upheld the search for that reason.[47] Significantly, the Tenth Circuit had no basis to determine the nature or scope of the investigatory methods used to verify Roach's residence but still held that *Leon's* minimal nexus requirement was met.

Based on the Tenth Circuit's guidance in *Roach*, the Court concludes that it was not "entirely unreasonable" for the executing officers to rely on the search warrant. Nothing in *Roach* demonstrates that law enforcement did more to verify Roach's residence in that investigation than the FBI did to verify Stein's residence in this case. For example, like the affiant in *Roach*, TFO Moore explicitly stated that he knew the place to be searched was Stein's residence; additionally, he swore that all facts in the affidavit came from his "personal observations," his "training and experience," and "information obtained from other law enforcement officers, federal agents, and witnesses." More importantly, TFO Moore stated that Stein routinely returned to the residence described as Stein's home after meeting with his co-conspirators. This fact, without more, likely

---

[46] *Roach*, 582 F.3d at 1204.

[47] *Id.*

falls short of the "substantial basis" needed for probable cause that Stein resided there. However, pursuant to *Roach,* it does satisfy *Leon*'s "minimal nexus" requirement. Thus, to the extent the warrant failed to demonstrate the mobile home was Stein's residence, the good-faith exception precludes suppression.

Finally, although the Court holds that probable cause existed that Stein used a computer in furtherance of the conspiracy and kept evidence of the conspiracy at his residence, the Court will still address the Government's argument, made in the alternative, that—even if the warrant lacked probable cause on these matters—the good-faith exception would preclude suppression.

Stein argues the good-faith exception should not apply, pointing to three examples where it is objectively unreasonable for an officer to rely on a search warrant: (1) when the magistrate judge issuing the warrant was misled by a deliberately or recklessly false affidavit; (2) when the magistrate wholly abandoned its detached and neutral judicial role; (3) when the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."[48] Stein claims that the Magistrate Judge here must have wholly abandoned its detached and neutral judicial role or, alternatively, that the Magistrate Judge was misled by the affiant. This argument lacks merit. Stein provides no reason for the Court to believe the Magistrate Judge abandoned its judicial role other than he disagrees with the Magistrate Judge's decision. This is insufficient to prevail under this factor.[49] Likewise, Stein points to nothing in the affidavit that was knowingly or recklessly false. Granted, Stein takes issue with the affiant's decision to omit certain information from the affidavit. But this, again, does not make the contents of the

---

[48] *See Danhauer*, 229 F.3d at 1007 (citations omitted).

[49] *See United States v. Aikman*, 2010 WL 420063, at *5 (D. Kan. 2010) (rejecting defendant's unsupported argument that issuing judge did not read the warrants and affidavits and, thus, abandoned its judicial role).

affidavit false. As discussed above, the Court concludes that the omitted information, if included in the affidavit, would not have changed the Magistrate Judge's decision. Thus, the Court disagrees that the Magistrate Judge was misled by these omissions.

Finally, Stein argues that the warrant affidavit was so lacking in indicia of probable cause—what is often called a "bare bones" affidavit[50]—that it was unreasonable for the executing officers to rely on it. The Court concludes otherwise. The affidavit contained 11 pages detailing Stein's involvement in a complex conspiracy to use a weapon of mass destruction, and the affidavit included additional information connecting Stein's residence to the conspiracy. Even if the Magistrate Judge erred in concluding there was probable cause to search Stein's residence, it was not unreasonable for an objective officer acting in good faith to execute the search under the belief the warrant was valid. Thus, the Court holds that the good-faith exception to the exclusionary rule provides an independent reason to deny Stein's motion to suppress regarding the search of Stein's residence for a computer and other items related to the conspiracy.

### III.    Conclusion

The warrant to search Stein's residence contained no material omissions and, therefore, did not violate *Franks*. Furthermore, the Court denies Stein's motion to suppress. The search warrant affidavit provided the Magistrate Judge with a substantial basis to find probable cause to search Stein's residence. Specifically, the affidavit provided a reasonable basis to conclude Stein owned and used a computer in furtherance of the conspiracy to use a weapon of mass destruction, provided sufficient reason to believe Stein kept evidence of his suspected crimes at his residence, and stated with sufficient particularity the items to be seized. Furthermore,

---

[50] *See Herring v. United States*, 555 U.S. 135, 146 (2009).

although the search warrant failed to adequately show that the place to be searched was, in fact, Stein's residence, it was not entirely unreasonable for the officers to rely on the search warrant's validity. Lastly, even if the warrant lacked probable cause that Stein used a computer or kept evidence at his residence, the good-faith exception provides an independent reason to deny Stein's motion to suppress.

**IT IS THEREFORE ORDERED** that Stein' Motion to Dismiss Evidence Seized from Mr. Stein's Residence and Request for Franks Hearing (Doc. 30) is **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that Stein's request for a *Franks* hearing is **GRANTED** and the Court, taking judicial notice of the transcript of the March 19, 2018, *Franks* hearing in Stein's other criminal case, holds no *Franks* violations occurred.

**IT IS FURTHER ORDERED** that Stein's Motion to Suppress is **DENIED**

**IT IS SO ORDERED**.

Dated this 23rd day of October, 2018.


*Eric F. Melgren*
ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE